# In the United States Court of Federal Claims

No. 10-479C
Filed: December 28, 2010
**TO BE PUBLISHED**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| | * Administrative Dispute Resolution Act |
| | * of 1996, Pub. L. No. 104-320 § 12; |
| BANNUM, INC., | * 110 Stat. 3870, 3874; |
| | * Administrative Procedure Act, 5 U.S.C. |
| Plaintiff, | * § 706(2)(A); |
| | * Administrative Record; |
| v. | * Bid Protest Jurisdiction, 28 U.S.C. § |
| | * 1491(b)(1); |
| THE UNITED STATES, | * Federal Acquisition Regulations, |
| | * 48 C.F.R. §§ 12.602(a), |
| Defendant, | * 15.209(a)(2), 15.206(d), 15.305(a), |
| | * 42.1503(b), 52.215-1(c)(9); |
| and | * 10 U.S.C. § 2305(b)(1) |
| | * Intervenor Standing, RCFC 24(a)(2); |
| DISMAS CHARITIES, INC., | * Judgment on the Administrative |
| | * Record; RCFC 52.1(c); |
| Defendant-Intervenor. | * Post Award Bid Protest; |
| | * Standing, 28 U.S.C. § 1491(b)(1); |
| | * Savannah Ga. Zoning Regulations §§ |
| | * 8-3002, 8-3025(b)(10n)(a-e). |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Joseph A. Camardo, Jr.**, The Law Office of Joseph A. Camardo, Jr., Auburn, New York, Counsel for Plaintiff.

**Paul Davis Oliver**, United States Department of Justice, Civil Division, Washington, D.C., Counsel for Defendant.

**Alexander D. Tomaszczuk**, Pillsbury Winthrop Shaw Pittman, LLP, McLean, Virginia, Counsel for Defendant-Intervenor.

## MEMORANDUM OPINION AND FINAL ORDER[1]

**BRADEN,** *Judge.*

On July 26, 2010, Bannum, Inc., ("Bannum") filed a post-award bid protest in the United States Court of Federal Claims challenging the April 6, 2010 award of a contract by the Federal Bureau of Prisons ("BOP") to Dismas Charities, Inc. ("Dismas") to provide a Residential

---

[1] This Memorandum Opinion and Final Order originally was filed under seal on December 20, 2010.  All redactions are denoted with brackets.

Reentry Center, or a halfway house ("RRC" or "facility"), and services ("RRC services") for federal offenders in Savannah, Georgia.

To facilitate a review of this Memorandum Opinion and Final Order, the court has provided the following outline:

**I.      RELEVANT FACTUAL BACKGROUND.**

     **A.      The Pre-Solicitation Period.**

     **B.      The Solicitation's Requirements.**

     **C.      The Source Selection Evaluation Plan.**

          **1.      Past Performance.**

          **2.      Technical/Management.**

          **3.      Price.**

     **D.      Offerors' Proposals.**

          **1.      Past Performance.**

          **2.      Technical/Management.**

               **a.      Site Validity.**

               **b.      Community Relations.**

          **3.      Price.**

     **E.      The Competitive Range Designation And Pre-Selection Negotiations.**

     **F.      The Source Selection Evaluation.**

          **1.      Past Performance.**

          **2.      Technical/Management.**

          **3.      Price.**

     **G.      The Source Selection Award.**

II.  **PROCEDURAL HISTORY.**

    A.  **At The Government Accountability Office.**

    B.  **At The United States Court Of Federal Claims.**

III.  **DISCUSSION.**

    A.  **Jurisdiction.**

    B.  **Standing.**

        1.  **Plaintiff Has Standing.**

        2.  **Defendant-Intervenor Has Standing.**

    C.  **Standard Of Review On A Motion Upon The Administrative Record.**

    D.  **Issues Raised By Plaintiff's Motion For Judgment On The Administrative Record.**

        1.  **Whether The Bureau Of Prisons Adhered To The Solicitation Evaluation Criteria.**

            a.  **Plaintiff's Argument.**

            b.  **Government's Response.**

            c.  **The Intervenor's Response.**

            d.  **The Court's Resolution.**

        2.  **Whether The Bureau Of Prisons Properly Evaluated Plaintiff's Technical/Management Proposal.**

            a.  **Plaintiff's Argument.**

            b.  **Government's Response.**

            c.  **The Intervenor's Response.**

            d.  **The Court's Resolution.**

        3.  **Whether The Bureau Of Prisons Considered Plaintiff's Most Recent Past Performance Information.**

            a.  **Plaintiff's Argument.**

        **b.**      **Government's Response.**

        **c.**      **Intervenor's Response.**

        **d.**      **The Court's Resolution.**

    **4.**    **Whether The Bureau Of Prisons Considered The Relevance And Import Of Plaintiff's Experience As The Incumbent Contractor.**

        **a.**      **Plaintiff's Argument.**

        **b.**      **Government's Response.**

        **c.**      **The Intervenor's Response.**

        **d.**      **The Court's Resolution.**

**IV.**    **CONCLUSION.**

\* \* \*

**I.**    **RELEVANT FACTUAL BACKGROUND.**[2]

    **A.**    **The Pre-Solicitation Period.**

On August 4, 2008, the BOP filed a Request For Contract Action Replacement ("RCA") anticipating the expiration of a contract that was being performed by Bannum. AR 1401. The new proposed contract term was for a two-year period beginning September 1, 2009, with three one-year options. AR 1403. The requirements were described both in terms of inmate days and beds, *i.e.*, for the two-year base period -- 31,390 inmate days or 43 beds; for option year one -- 17,202 inmate days or 47 beds; for option year two -- 17,885 inmate days or 49 beds; and for option year three -- 18,980 inmate days or 52 beds. *Id.*

On August 22, 2008, the BOP issued a Request For Information, RFI 200-1050-SE ("RFI"), for RRC services in Savannah, Georgia. AR 11. The purpose of the RFI was to determine whether "qualified sources" would be able to meet the BOP's requirements. *Id.* The RFI also stated that the proposed contract would require "approximately thirty-eight (38) beds for the two-year base period; forty-one (41) beds for Option Year #1; forty-two (42) beds for Option Year #2; and forty-four (44) beds for Option Year #3." *Id.*

On September 19, 2008, the BOP issued a Presolicitation Notice ("PSN") for Solicitation Number RFP-200-1050-SE that conformed to the requirements of the RCA. AR 3. The PSN stated: "the estimated number of inmate days is 31,390 for the two-year base period; 17,202 for

---

[2] The facts cited herein were derived from the Administrative Record ("AR"), filed on August 5, 9, and 12, 2010 and completed by court order on September 3, 2010 ("AR 1-1604").

option year one; 17,885 for option year two; and 18,980 for option year three." *Id.* Unlike the RFI, however, the PSN described the requirements only in terms of inmate days, not numbers of beds.

On September 23, 2008, the Vice President of Business Development for Dismas Charities sent an e-mail to the BOP Contracting Officer ("CO") regarding the estimated bed requirement in option year three:

> [T]he City of Savannah zoning requirements have a 50 resident cap for a community correctional center[3] as a permitted use. . . .  This will make it very difficult to obtain a viable site if the estimated occupancy for the new contract is maintained at 52 residents for the 3rd Option Year as currently specified in the Presoliciation Notice published last week.

AR 422.

In response, the CO sent an e-mail to the BOP's Contract Specialist requesting verification of Savannah's zoning limitations on community correctional centers,[4] noting: "It's

---

[3] Community correctional centers are defined as:

> A facility operated by a nonprofit organization under contract with a state or federal correctional agency for the purpose of housing convicted offenders for a transitional period (usually eight months) prior to their release back into the community.  While in the facility, offenders are required to participate in a comprehensive rehabilitation program, which includes job training and employment experiences.

City of Savannah Zoning Regulations ("Sav. Zon. Reg.") § 8-3002.

[4] Savannah Zoning Regulations require community correctional centers to comply with the following five restrictions:

a. Such use shall not be located within 300 feet of any conforming one-family, two-family, or multifamily dwelling structure, nor on a lot where within the same block a conforming one-family, two-family, or multifamily dwelling structure is located, nor across the street from an R (residential) zoning district.

b. A site development plan shall be reviewed under the provisions of section 8-3031 to insure [sic] that the use is oriented in the best manner to protect adjacent uses.

c. One hundred square feet of space shall be provided in the building for each occupant, including staff.

d. Each center shall have a staff manual setting forth established procedures for

possible we may have to reduce the number of beds for that period." *Id.* The Contract Specialist replied: "It appears that there is a cap on the [number] of residents for the city of Savannah. The RCA may need to be modified." *Id.*

On September 29, 2008, Bannum's President wrote a letter to the BOP Contract Specialist, expressing concern about the increased requirements described in the PSN:

> Since the inception of the contract in September, 2004 through August 31, 2008, the population at Bannum Place of Savannah has averaged [redacted] residents (calculated to a "full pay" basis, which accounts for the half rate for home confinement and furlough). Moreover, the population for the past twelve-month period has averaged [redacted]. However, on September 19, 2008, the BOP posted the presolicitation notice which now estimates forty three (43) beds for the two year Base Period and increasing to fifty-two (52) beds for Option Year 3. The BOP estimate of 43 beds for the Base Period represents a [redacted] the current average contract actual usage. Additionally the BOP estimate of 52 beds for Option Year 3 represents a [redacted] the current average contract <u>actual</u> usage.

AR 424 (bold and underline in original). Bannum's President requested the BOP to reduce "estimates for this [S]olicitation to a level that is more commensurate with the actual historical usage which is the most reliable population data currently available." AR 425.

On September 30, 2008, the BOP modified the June 30, 2008 RCA, reducing the estimate for option year three from 18,980 inmate days or 52 beds to 18,250 inmate days or 50 beds. AR 1408. On October 1, 2008, the BOP modified the estimated inmate days in the PSN to 18,250 for option year three. AR 4.

### B. The Solicitation's Requirements.

On December 9, 2008, the BOP issued RFP 200-1050-SE ("the Solicitation") seeking bids for an "indefinite delivery, requirements type contract with firm-fixed unit prices." AR 14, 19. The final estimated requirements were identical to the June 30, 2008 RCA and the October 1, 2008 PSN, *i.e.*, 31,390 inmate days for the base period; 17,202 inmate days for option year one; 17,885 inmate days for option year two; and 18,250 inmate days for option year three. AR 19. The Solicitation did not describe the requirements in terms of beds. *Id.*

---

emergency evacuation, medical emergencies, and security procedures.

e. A maximum of 50 persons, in addition to the staff, shall be housed in the center. One staff security guard and one staff supervisor shall be on-site at all times the facility is occupied.

Sav. Zon. Reg. § 8-3025(b)(10n)(a-e).

The Solicitation provided that only a portion of the estimated "inmate days" would be dedicated to full-time resident inmates, and a percentage of the inmate days would be used for "live-out" programs. *Id.* Specifically, the Solicitation provided that an estimated 80% of the inmate days would consist of "Regular Inmate days"; 20% of the inmate days would consist of "Home Confinement Inmate days";[5] and less than 1% of the estimated days would consist of "Furloughed Inmate days."[6] *Id.* In addition, prospective bidders were advised that the estimates in the Solicitation did not guarantee "that the estimated quantities will be required or ordered, or that conditions affecting the requirement will be stable." AR 19-20. Instead, estimated inmate days were contract maximums. AR 170-71.

As the Solicitation represented:

(b) Maximum Order. The contractor is not obligated to honor—

(1) Any order for a single item in excess of 31,390 for the two-year base period and 17,202 for Option Year One, 17,885 for Option Year Two, and 18,250 for Option Year Three; cited due to this being requirements type contract. . . .

(2) Any order for a combination of items in excess of items in excess of [sic] 31,390 for the two-year base period and 17,202 for Option Year One, 17,885 for Option Year Two, and 18,250 for Option Year Three; cited due to this being requirements type contract. . . .

(3) A series of orders from the same ordering office within 365 days that together call for quantities exceeding the limitation in subparagraph (b)(1) or (2) of this section.

(c) If this is a requirements contract (i.e., includes the Requirements Clause at subsection 52.216-21 of the Federal Acquisition Regulation (FAR)), the Government is not required to order a part of any one requirement from the Contractor if that requirement exceeds the maximum-order limitations in paragraph (b) of this section.

(d) Notwithstanding paragraphs (b) and (c) of this section, the Contractor shall honor any order exceeding the maximum order limitations in paragraph (b) unless that order (or orders) is returned to the ordering office within 10 days after issuance with written notice stating the Contractor's intent not to ship the item (or items) called for and the reasons.

---

[5] The Solicitation defined "Home Confinement" as "a generic term used to cover all circumstances in which a federal offender is required to remain at home during non-working hours of the day." AR 148. "Per diem rates for inmates placed on Home [C]onfinement and [F]urloughed shall be one half the full contract per diem rate." AR 20.

[6] Furloughed is not defined in the Solicitation.

AR 170-71.

### C.     The Source Selection Evaluation Plan.

The Source Selection Plan provided that the BOP's objective was to identify the contractor that provided the "Best Value to the Federal Bureau of Prisons." AR 1264. To achieve this objective, a Source Selection Evaluation Board ("SSEB") was established to evaluate each element of the Technical/Management proposals, "giving the highest rating to the best overall approach." AR 242. The SSEB's recommendation would then evaluated by the CO, who was designated as the Source Selection Authority ("SSA"), authorized to review the proposals and award the contract. AR 1264.

Offerors would be evaluated in three major areas: Past Performance, Technical/ Management, and Price. AR 242. These three evaluation areas, however, were not of equal weight:

> Technical/Management and Past Performance, when combined (Non-Price), are significantly more important than Price. In the Non-Price areas, Past Performance is more important than Technical/Management. . . . Offerors should recognize that Price, although of lesser importance than the Technical/Management and Past Performance, might contribute substantially to the Source Selection Official's (SSO's) contract award decision. As the evaluation of competing offeror proposals in the Technical/Management and Past Performance areas become more equal in rating, the more important Price will become in selecting the best value for the Government.

*Id.*

For each evaluation area and its factors and subfactors, offerors were assigned one of four color/adjectival ratings:

> **BLUE – Very Good:** Offeror's proposal meets and exceeds the requirements of the solicitation. Their proposal shows they have a very good solution for meeting the needs and objectives of the program. One or more significant strengths exist. Weaknesses may exist, but none are considered significant and are easily correctible.

> **GREEN – Acceptable:** Offeror's Proposal meets the minimum requirements of the solicitation. Their proposal shows they have an acceptable solution for meeting the needs and objectives of the program. Strengths and weaknesses may exist. The weaknesses are correctible.

> **YELLOW – Poor:** Offeror's proposal does not meet some of the requirements of the solicitation. Their proposal shows they have a poor solution for meeting the needs and objectives of the program. Weaknesses outweigh any strengths that may exist. The weaknesses are difficult to correct.

**RED – Unacceptable:**  Offeror's proposal fails to meet the requirements of the solicitation.  Their proposal shows they have an unacceptable solution for meeting the needs and objectives of the program.  There are numerous weaknesses.  The weaknesses will be very difficult to correct or are not correctible.

*Id.*

1. **Past Performance.**

To assess Past Performance, the Solicitation instructed offerors to submit the five "most relevant contracts and/or subcontracts that were, or are currently being, performed in the past [three] years."  AR 201.  Past Performance was to be evaluated "by reviewing aspects of an offeror's relevant[7] present and recent past performance[.]"  AR 242.  In making this assessment:

The recency and relevancy of Past Performance information is critical to the Government's evaluation.  More recent, more relevant performance information will have a greater positive impact on the Past Performance evaluation than less recent, less relevant performance. . . .  Where relevant performance record indicates performance problems, the Government will consider the number and severity of the problems and the appropriateness and effectiveness of any corrective actions taken (not just planned or promised).  The Government may review more recent contracts or performance evaluations to ensure corrective actions have been implemented and to evaluate their effectiveness.

AR 242-43.

Overall, Past Performance was to be determined based on five factors of equal weight: (1) Accountability; (2) Programs; (3) Community Relations; (4) Personnel; and (5) Communications and Responsiveness.  *Id.*

2. **Technical/Management.**

The Technical/Management area included five factors: (1) Site Location; (2) Accountability; (3) Programs; (4) Facility; and (5) Personnel.  AR 243.  Each was of equal weight.  *Id.*  In addition, the BOP was required to conduct a "Risk Assessment" for the Technical/Management proposal as a whole.  AR 244.  "Risk Assessment" reflected "the [BOP's] degree of confidence in the offeror's ability to perform the effort described in their Technical/Management proposal."  *Id.*  This assessment included any potential adverse impacts on "price, schedule or performance of the effort."  *Id.*  All evaluation factors within the "Technical/Management" assessment area would also receive an individual risk assessment.  *Id.*

---

[7] "Relevance," for purposes of the Solicitation, "refers to contracts that are of similar size, scope, and complexity" as the current procurement.  AR 201.  "Offeror's past performance evaluations may be negatively impacted if they submit contracts in response to these instructions which are considered less relevant or irrelevant[.]"  AR 243.

The "Site Location" factor consisted of two subfactors: Site Validity and Suitability[8] ("Site Validity"); and Community Relations Program. AR 243. Site Validity "evaluate[d] the proposed site location and consider[ed] the validity of the offeror's Right-to-Use and Zoning approval." *Id.* The assessment of Site Validity included "both the legality of the instrument and the nature of the interest and appropriate zoning as it relates to any potential risk it poses to the [G]overnment." *Id.* The offeror was required "to maintain proper zoning throughout the life of the contract." AR 204. Failure to establish and maintain proof of zoning and ordinance requirements "may result in elimination from the competitive range prior to award, and termination for default following award." *Id.* The Community Relations Program subfactor "evaluate[d] the innovativeness, credibility and effectiveness of the offeror's proposed program for education and interacting with the local community in order to acquire and maintain public support." AR 243.

The Solicitation required that offerors include in their proposals "proof that the law enforcement agency with primary jurisdiction . . . and at least two levels of government officials . . . have been notified of their intent to open and operate a community corrections program as identified in the [S]olicitation." AR 238. The Solicitation included a sample Community Notification letter that suggested that the following language be used:

> The total term of the proposed contract is _____ years. The estimated requirement specifies _____ beds for males and ____ beds for females at the beginning of the contract term, increasing incrementally to _____ beds for males and ____ beds for females at the end of the contract term. These numbers reflect the BOP's best estimates of bed space need at this time. However, the proposed site will be able to accommodate up to _____ offenders, and the BOP may exceed its original estimates if there is an unanticipated need for additional bed space in this area.

AR 191.

### 3. Price.

The BOP did not assign a score or rating for the price factor; instead the proposed price would be evaluated: "to ensure it is reasonable"; "against the evaluation results of the Non-Price areas in conducting possible tradeoff analysis"; and "[in] determining the best value to the Government." AR 244.

---

[8] "Site Validity and Suitability" did not require a separate risk assessment, because "the level of risk associated with the offeror's proposal is inherent in the subfactor definition and will thus be reflected in the subfactor color/adjective rating and rationale." AR 244.

### D.      Offerors' Proposals.

On March 9, 2009,[9] Bannum and Dismas each submitted proposals.  AR 426-685; AR 686-795.  These were the only proposals proffered in response to the December 9, 2008 Solicitation.  AR 1268.

#### 1.      Past Performance.

Bannum's proposal submitted the following five contracts as references for Past Performance: [redacted].  AR 671-685.  In discussing Past Performance, Bannum exclusively cited to completed, finalized Contract Evaluation Forms[10] ("CEFs").  *Id.*  Specifically, Bannum cited: [redacted].  AR 671-685.

Dismas's Past Performance proposal was not included in the Administrative Record.

#### 2.      Technical/Management.

The offerors' proposals responded to each of the five factors that make up the Technical/Management area: (1) Site Location; (2) Accountability; (3) Programs; (4) Facility; and (5) Personnel.  AR 426-577; AR 686-795.  Of particular importance was Site Location, consisting of two subfactors: Site Validity and Community Relations.

#### a.      Site Validity.

Bannum's March 9, 2009 Proposal demonstrated Site Validity by submitting: a letter of occupancy; a July 18, 2001 Lease Agreement; a Certificate of Occupancy; and a letter from the Savannah Airport Commission.  AR 435; AR 436-454; AR 458; AR 459.  The letter of occupancy was from the Executive Director of the Savannah/Hilton Head International Airport, and confirmed that Bannum had beneficial occupancy of land at the airport as of September 1, 2004.  AR 435.  The July 18, 2001 Lease Agreement provided for a two-year term beginning when Bannum received beneficial occupancy of the land, with eight option periods of one year each.  AR 436.  The Certificate of Occupancy was issued by the City of Savannah Department of Inspections, and stated that Bannum was located in Use Zone I-L/15.  AR 458.  Bannum represented that the Certificate of Occupancy was "in and of itself, proof that our [facility] was properly zoned and had obtained all necessary approvals."  AR 456.

The letter from the Savannah Airport Commission stated:

The airport, as a public body corporate organized under the laws of the State of Georgia, does not require prospective tenants to provide identification of a zoning

---

[9] Bids were originally due on February 9, 2009, but BOP postponed the date until March 9, 2009.  AR 17; AR 388.

[10] Contract Evaluation Forms are "annual assessments that grade contractors with 'overall performance' scores."  48 C.F.R. § 42.1503.

district.  The airport is, in itself, its own zoning district.  The issuance of a building permit to Bannum when the facility was constructed in 2004 would constitute proof that the building lies within an appropriate zoning district.

AR 459.

Dismas established Site Validity by submitting: a December 19, 2008 Contingency Purchase Contract For Real Estate between A&V Electric Company, Inc. and Dismas; a Savannah Area Geographic Information System map confirming that the proposed facility is located in a I-H Zone (Heavy Industrial Zone); and a letter from the Administrator for the City of Savannah's Zoning Commission[11] confirming that the property was zoned I-H, and noting that CCCs are an acceptable use in I-H zones, but are subject to the five restrictions set forth in Sav. Zon. Reg. § 8-3025(b)(10n)(a-e).  AR 690-693; AR 694; AR 695-696.

**b.   Community Relations.**

In order to meet the Solicitation's Community Relations Program requirements, Bannum wrote letters to the Mayor of Savannah; the Alderman of District 1; and the Savannah Chief of Police.  AR 487; AR 494; AR 501.  Each letter stated:

The total term of the proposed contract is five years.  The estimated requirement specifies 38 beds for males and 5 beds for females at the beginning of the contract term, increasing incrementally to 44 beds for males and 6 beds for females at the end of the contract term.  These numbers reflect the BOP's best estimates of bed space need at this time.  However, the proposed site will be able to accommodate up to 55 offenders, and the BOP may exceed its original estimates if there is an unanticipated need for additional bed space in this area.

*Id.*

Dismas sent similar letters to the same officials stating:

The total term of the proposed contract is five years.  The estimated requirement specifies a minimum of 38 beds for males and 5 beds for females and a maximum of 44 beds for males and 6 beds for females throughout the five-year term.  These numbers reflect the BOP's best estimates of bed space need at this time.  Our site will be able to accommodate up to 50 offenders, and the BOP may exceed its original estimates if there is an unanticipated need for additional bed space in this area.

AR 702; AR 705; AR 708.

---

[11] The Zoning Administrator is responsible for the enforcement of the jurisdiction's zoning ordinances.  AR 695.

### 3.    Price.

Bannum initially proposed a price of [redacted] for the five year contract; whereas Dismas proposed a price of [redacted].  AR 1257-58.

### E.    The Competitive Range Designation And Pre-Selection Negotiations.

On April 11, 2009, the BOP completed a preliminary report of an April 7-8, 2009 inspection of Bannum and Dismas's facilities, observing that the City of Savannah zoning ordinances require that "one hundred square [feet] of space shall be provided in the building for each occupant, including staff."  AR 796-97; *see also* Sav. Zon. Reg § 3025(b)(10n)(c).  With respect to Bannum, the report observed:

> While the building meets [the] BOP requirements for occupancy loads, and Bannum has previously submitted documentation from the base fire department to support this, there remains a conflict with the city ordinance, which needs to be rectified.  Occupancy loads and zoning requirements are not the same and since the City of Savannah issued the Certificate of Occupancy it has jurisdiction over zoning issues.

AR 797.

As for Dismas, the report stated:

> [T]his offeror inquired and received notice from the City of Savannah on February 11, 2009, stating the RRC had to comply with the 100 square foot requirement per occupant in order to be in compliance with the city zoning ordinance for an RRC.

*Id.*

On April 14, 2009, after completing a second preliminary site inspection, the BOP found that Bannum:

> proposes to accommodate 44 males and 6 females, but will be able to house up to 52 residents. . . .  The facility is presently operating as a RRC; therefore, zoning has been established.  Due to the Airport Commission having control over all land within the airport boundaries, zoning has been approved.  Documents provided regarding the approval consist of: Zoning Approval, [an] e-mail from [the] Properties Manager of Savannah Airport Commission, and a Certificate of Occupancy from the City of Savannah Department of Inspections.

AR 799.

On June 23, 2009, the BOP informed Bannum that it was determined to be within the competitive range.  AR 805.  But, as to the Site Validity subfactor, clarification was requested as

to how Bannum would adhere to "the 100 square footage space for occupant and staff, as required by the letter from the zoning administrator." AR 805-806; *see also* Sav. Zon. Reg. § 3025(b)(10n)(e). On July 3, 2009, Bannum responded:

> The proposal which Bannum submitted in response to this RFP did not contain a letter from the "zoning administrator" because, as the incumbent contractor, Bannum's current [RRC] has previously received zoning approval. In fact, we have a valid and current "Certificate of Occupancy[."] Our proposal contained a discussion of zoning approval, a copy of the "Certificate of Occupancy[,"] and a copy of an e-mail from the Savannah Airport staff. . . . Therefore, we documented that Bannum's proposed place of performance meets all zoning, building and fire codes and regulations. . . .
>
> [S]everal months ago, a Savannah Fire Inspector questioned our facility's occupancy load. In response, Bannum successfully proved to that [the facility] has an occupant load of up to 62 persons. . . . Therefore, [the square footage requirements for occupant and staff members] does not apply to our facility. Also since this [S]olicitation only requires that Bannum provide up to 50 beds (50 offenders) during the third option period, and our current and proposed place of performance has an occupancy load of up to 62 offenders and staff at any one time, Bannum's proposed place of performance meets all local zoning, building, fire and occupancy codes.

AR 893-893a.

On June 24, 2009, the BOP notified Dismas that it also was within the competitive range, but requested additional information on how Dismas would adhere to the 100 square foot per occupant and staff member requirement set forth in Sav. Zon. Reg. § 8-3025(b)(10n)(c). AR 825. On June 30, 2009, Dismas responded that its proposed RRC met and exceeded the 100 square foot per occupant standard, since the building is "over 8,000 square feet and a maximum of 50 occupants can be housed at one time, leaving ample additional square footage to account for staff members." AR 841; AR 845.

On September 14, 2009, the BOP asked Dismas how it would meet the requirement in Sav. Zon. Reg. § 8-3025(b)(10n)(e) that one staff security guard and one staff supervisor be on site at all times. AR 953. On September 22, 2009, Dismas responded that it would [redacted]. AR 954.

On October 1, 2009, the BOP's Community Corrections Specialist prepared a memorandum analyzing the offerors' Technical/Management proposals. AR 963.

On October 8, 2009, the BOP requested final proposal revisions from Bannum and Dismas addressing price and identifying the facilities' key personnel. AR 976; AR 980. On October 16, 2009, Dismas submitted a Final Proposal Revision, emphasizing that its RRC "can accommodate up to 50 residents and is readily expandable up to 68." AR 1000; AR 1002.

On December 18, 2009, the CO completed a review of the offerors' Past Performance. AR 1011-1175.

On February 22, 2010, the BOP issued a determination of responsibility, stating:

Dismas has provided acceptable Right to Use and Zoning Documentation for the proposed facility.  The proposed facility can accommodate 50 inmate beds.  The requirement for this contract is 43 beds for . . . the two-year base period; 47 beds for option year 1, 49 beds for option year 2, and 50 beds for option year 3.

AR 1176.

On March 12, 2010, the CO completed a price analysis, concluding that both final price proposals ([redacted] for Bannum; and [redacted] for Dismas) were "fair and reasonable in that: [t]hey are each comparable to other prices received in response to the [S]olicitation; [t]hey adequately represent what contract performance should cost in this location for same or similar services; and [t]hey are both below the overall cost projected by the [Independent Government Estimate]."  AR 1259; AR 1260.

## F.     The Source Selection Evaluation.

### 1.     Past Performance.

Bannum provided five past performance references.  AR 1269.  Of these, the BOP concluded that only one contract—the incumbent contract in Savannah—was Highly Relevant. *Id.*  The remaining contracts in: [redacted] were determined to be Moderately Relevant, *i.e.*, although they were "similar in scope" and "complexity," they differed in "size." AR 1274.

The BOP attributed eight strengths to Bannum's Past Performance.  AR 1269-1270. Bannum's strengths included: [redacted].  *Id.*

On the other hand, the BOP identified the following weaknesses in Bannum's Past Performance: [redacted].  AR 1271-73.

The CO concluded:

Only one contract (the incumbent) was considered "highly relevant" and received an overall [redacted] ratings.  Three of the "moderately relevant" contracts (similar in scope and complexity but differ in size) received [redacted] ratings and one received a [redacted] rating.  The [redacted] cited among the contracts evaluated far outweighed [redacted].  As a result of this analysis, and after a careful review of the most recent past performance evaluations on file, Bannum received an overall [redacted] Past Performance rating for contracts submitted for RFP 200-1050-SE.

AR 1274.

The following chart summarizes the BOP's Source Selection Decision analysis of Bannum's Past Performance:

**Table 1.  Bannum, Inc.  Past Performance.**

| Factors | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | Overall Rating per Factor |
|---|---|---|---|---|---|---|
| | **Highly Relevant** | **Moderately Relevant** | **Moderately Relevant** | **Moderately Relevant** | **Moderately Relevant** | |
| Accountability | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Programs | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Community Relations | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Personnel | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Communications/ Responsiveness | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Overall Rating | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

AR 1269.

Dismas also submitted five past performance references: [redacted].  AR 1274.  Because each contract was for a "Major Use" RRC—*i.e.*, housing with 31 or more beds—each contract was deemed Highly Relevant.  AR 1274.  Dismas had one [redacted].  AR 1278.  Based on these references, the BOP identified 17 strengths in Dismas's Past Performance, including: [redacted]. AR 1274-78.

As a result, Dismas received an overall Past Performance rating of [redacted], as the following chart shows:

**Table 2.  Dismas Charities, Inc. Past Performance.**

| Factors | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | Overall Rating per Factor |
|---|---|---|---|---|---|---|
| | **Highly Relevant** | **Highly Relevant** | **Highly Relevant** | **Highly Relevant** | **Highly Relevant** | |
| Accountability | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [missing] |
| Programs | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [missing] |
| Community Relations | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [missing] |
| Personnel | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [missing] |
| Communications/ Responsiveness | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [missing] |
| Overall Rating | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

AR 1274.

### 2.     Technical/Management.

Since Bannum met the minimum requirements of the Solicitation for three factors (Site Location, Programs, and Facility), and exceeded the requirements in two factors (Accountability and Personnel), it received an overall consensus rating for Technical/Management of [redacted] and an assessment of [redacted] Risk.   AR 1280.   As for the Site Validity and Suitability subfactor, accounting for half of the Site Location factor, the BOP found:

> Bannum provided a copy of a Land Lease Agreement, signed by both parties, as their valid right to use.   They provided [a] City of Savannah certificate of Occupancy as proof of zoning.   The Savannah Airport Commission is a "public body corporation organized under the laws of the State of Georgia," and zoning approval was inherent in the "Space Lease Agreement" between Bannum and the Savannah Airport Commission.   A memo from the airport personnel confirms that the airport is, in itself, its own zoning district. . . .   No strengths or weaknesses noted in this subfactor.

AR 1281-82.

By contrast, Dismas received a consensus rating of [redacted] for Technical/Management and an assessment of [redacted] Risk.   AR 1279.   The BOP determined that Dismas's proposal met minimum requirements of the Solicitation in two factors (Site Location and Facility) but exceeded the minimum requirements in three factors (Accountability, Personnel, and Programs).   *Id.*   Regarding the Site Validity and Suitability subfactor, the BOP found:

> Dismas provided a Contingency Purchase Contract for Real Estate, signed by both parties, and dated, as their valid right to use.   Zoning documentation provided was a letter from the Zoning Administrator referencing Use 10n, making it necessary for the community correctional center to adhere to five stipulations, one of which is that 100 square footage space for each occupant and staff member [sic].

> Another stipulation is to adhere to the one security guard and zone staff supervisor being on site at all times when the facility is occupied. Dismas addressed the stipulation fully in their discussions stating that their plan meets and exceeds the 100 square footage space requirement for each occupant and staff member and that [redacted]. . . . No Strengths or weakness noted in this subfactor.

AR 1280.

The Source Selection Decision made no mention of any potential difficulty that zoning presented for meeting the "inmate days" requirements of the contract in the base period or any of the three one-year option periods.

In sum, the BOP rated Dismas's Past Performance as [redacted] and Technical/Management as [redacted], with [redacted] Risk. AR 1290; AR 1293. Bannum received a rating of [redacted] for Past Performance and for Technical/Management criteria, with [redacted] Risk. AR 1291; AR 1295.

### 3.   Price.

The Independent Government Estimate for the project was [redacted]. AR 1289. Bannum proposed a price of [redacted]; Dismas proposed [redacted]. *Id.* The BOP reasoned that the value of the Dismas proposal justified paying [redacted] more than Bannum's price, because:

> Dismas'[s] proposal is the [redacted] rated non-price proposal, that exceeds the requirements of the SOW in Past Performance, exceeds the requirements in Technical/Management, and their price is fair and reasonable. For trade-off purposes, Dismas'[s] [redacted] rated non-price proposal warrants paying a premium over Bannum's lower priced proposal [as] Past Performance and Technical/ Management combined are significantly more important than Price.

AR 1296.

### G.   The Source Selection Award.

On April 6, 2010, the BOP awarded the contract to Dismas. AR 1298.

## II.   PROCEDURAL HISTORY.

### A.   At The Government Accountability Office.

On April 14 2010, Bannum filed Protest B-402730 with the Government Accountability Office ("GAO"), alleging that the BOP: violated the evaluation criteria specified in the Solicitation in rating Bannum's Technical/Management proposal; rated Bannum's Past Performance incorrectly by failing to give greater weight to the incumbent Savannah contract;

and rated Bannum's Past Performance incorrectly by failing to use Bannum's most recent Contractor Evaluation Forms.  AR 1364.  On July 26, 2010, the GAO rejected all three grounds for Bannum's protest.  AR 1359-69.

###### B.   At The United States Court Of Federal Claims.

On July 26, 2010, Bannum filed a Complaint ("Compl.") in the United States Court of Federal Claims challenging the BOP's decision to award the contract to Dismas.  On July 28, 2010, the court granted an oral motion by Dismas to intervene.  On the same day, the court issued a Protective Order.

On August 5, 9, and 12, 2010, the Government filed the Administrative Record ("AR 1-1416").  On August 6, 2010, the court issued an Order requiring the parties to file simultaneous Motions For Judgment Upon The Administrative Record on or before August 19, 2010 and simultaneous Responses on August 26, 2010.  On August 13, 2010, the court granted Bannum's Unopposed Motion For An Enlargement Of Time, affording the parties until August 24, 2010 to file simultaneous Motions For Judgment On The Record and until August 31, 2010 to file simultaneous Responses.

On August 24, 2010, all parties filed Motions For Judgment Upon The Administrative Record.  ("Pl. Mot."; "Gov't Mot."; "Int. Mot.").  Bannum also filed a Motion To Supplement The Administrative Record with the most recent Contractor Evaluation Form ("CEF") for Bannum's [redacted] RRC, for the period of January 1, 2009, to December 31, 2009.  On August 26, 2010, the Government filed a Response, requesting that the court deny Bannum's August 24, 2010 Motion, or, in the alternative, to Supplement the Administrative Record with 22 additional documents that reflect Bannum's more recent past performance evaluations.

On August 27, 2010 Bannum filed an unopposed Motion For Enlargement Of Time, requesting that the deadline to respond to the Motions For Judgment Upon The Administrative Record be extended to September 7, 2010.  On August 30, 2010, the court granted Bannum's August 27, 2010 Motion.

On September 2, 2010, the court convened a telephone status conference to discuss Bannum's August 24, 2010 Motion To Supplement The Administrative Record.  On September 3, 2010, the court denied Bannum's August 24, 2010 Motion To Supplement The Administrative Record, but granted Bannum and the Government's Motions To Complete The Administrative Record made orally during the September 2, 2010 status conference.  Accordingly, the court admitted additional documents on which the BOP may have relied or consulted prior to the April 6, 2010 award.[12]

On September 7, 2010, all parties filed Reponses to the August 24, 2010 Motions For Judgment Upon The Administrative Record ("Pl. Resp."; "Gov't Resp."; "Int. Resp.").

---

[12] The following additional documents were admitted and deemed by the court to be part of the Administrative Record, since they were available to or relied upon by the BOP in awarding a contract to Dismas pursuant to the December 9, 2008 Solicitation: [redacted].

On November 30, 2010, the court heard oral argument on the pending Cross Motions for Judgment Upon The Administrative Record ("11/30/10 TR at 1-72").

On December 1, 2010 Dismas filed a Notice proving its status as a not-for-profit entity. On December 13, 2010, Bannum filed a Supplemental Brief. On December 17, 2010, the Government filed a Response to Bannum's December 13, 2010 Supplemental Brief.

## III.  DISCUSSION.

### A.  Jurisdiction.

The July 26, 2010 post-award bid protest Complaint in this case alleged that the April 6, 2010 award to Dismas was "arbitrary, capricious and in violation of the law and regulation." Compl. ¶ 1. Specifically, the Complaint alleged that the BOP: violated the Solicitation Evaluation Criteria, because it did not require Dismas to comply with Savannah Zoning law, resulting in the offerors being improperly rated; failed to use the most recent Past Performance data; and failed properly to assess the effect of Bannum's performance of the incumbent contract. Compl. ¶¶ 1, 6-11; *see also* Pl. Mot. at 18, 19-36; Pl. Resp. at 3-19.

Pursuant to 28 U.S.C. § 1491(b)(1), the United States Court of Federal Claims has jurisdiction:

> to render judgment on an action by an interested party objecting to a solicitation by a federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or proposed procurement.

*Id.*

The court has determined that 28 U.S.C. § 1491(b)(1) authorizes the court to adjudicate the claims alleged in the July 26, 2010 Complaint.

### B.  Standing.

#### 1.  Plaintiff Has Standing.

As a threshold matter, a plaintiff contesting the award of a federal contract must establish that it is an "interested party" to have standing under 28 U.S.C. § 1491(b)(1). *See Myers Investigative & Sec. Servs., Inc.* v. *United States*, 275 F.3d 1366, 1369-70 (Fed. Cir. 2002) ("[S]tanding is a threshold jurisdictional issue[.]"). The United States Court of Appeals for the Federal Circuit has construed the term "interested party" as synonymous with "interested party" as defined by the Competition in Contracting Act ("CICA"), 31 U.S.C. § 3551(2)(A). *See Rex Serv. Corp.* v. *United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006) (citing decisions adopting the CICA definition of "interested party" for 28 U.S.C. § 1491(b)(1) purposes). A two-part test is applied to determine whether a protester is an "interested party": "a protestor must establish that: (1) it was an actual or prospective bidder or offeror, and (2) it had a direct economic interest in

the procurement or proposed procurement." *Distrib. Solutions, Inc.* v. *United States,* 539 F.3d 1340, 1344 (Fed. Cir. 2008).

A protestor also must show that the alleged errors in the procurement were prejudicial. *See Labatt Food Serv., Inc.* v. *United States*, 577 F.3d 1375, 1378-79 (Fed. Cir. 2009) ("It is basic that because the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits.") (internal quotation marks and citations omitted); *see also Myers*, 275 F.3d at 1370 ("[P]rejudice (or injury) is a necessary element of standing."). A party demonstrates prejudice when "it can show that but for the error, it would have had a substantial chance of securing the contract." *Labatt,* 577 F.3d at 1378. Importantly, a proper standing inquiry must not conflate the requirements of "direct economic interest" and prejudicial error. *Id.* at 1380 (explaining that examining economic interest but excluding prejudicial error from the standing inquiry "would create a rule that, to an unsuccessful but economically interested offeror in a bid protest, any error is harmful").

In this case, Bannum submitted a timely proposal in response to the December 9, 2008 Solicitation. AR 426-685. As an actual bidder and with a direct economic interest in the procurement, Bannum qualifies as an "interested party" within the meaning of 28 U.S.C. 1491(b)(1). *See Distrib. Solutions*, 539 F.3d at 1344 (To establish it is an interested party, the protester must show "(1) it was an actual or prospective bidder or offeror, and (2) it had a direct economic interest in the procurement or proposed procurement."). Turning to prejudice, the December 9, 2008 Solicitation's stated purpose was to identify the proposal that offered the "Best Value to the Federal Bureau of Prisons." AR 1264. Bannum and Dismas were the only two offerors and the BOP determined that both proposals were in the "competitive range." AR 1268-1297, AR 809; AR 825. If the BOP had rejected Dismas's proposal, Bannum would have been awarded the contract. Therefore, Bannum has established that it had a "substantial chance" to secure the BOP contract, and the threshold requirement of prejudice has been met. *See Bannum, Inc.* v. *United States*, 404 F.3d 1346, 1358 (Fed. Cir. 2005) ("To establish prejudice [Plaintiff] was required to show that there was a 'substantial chance' it would have received the contract but for . . . errors in the bid process.") (citations omitted).

For these reasons, the court has determined that Bannum has standing to pursue this bid protest in the United States Court of Federal Claims.

### 2.      Defendant-Intervenor Has Standing.

Rule 24(a)(2) of the United States Court of Federal Claims ("RCFC") provides, in relevant part:

On timely motion, the court must permit anyone to intervene who . . . claims an *interest relating to the property or transaction that is the subject of the action*, and is so situated that the *disposition of the action may* as a practical matter *impair or impede the movant's ability to protect its interest*, unless existing parties adequately represent that interest.

RCFC 24(a)(2) (emphasis added).

The United States Court of Appeals for the Federal Circuit has advised that "the requirements for intervention are to be construed in favor of intervention." *Am. Mar. Transp., Inc.* v. *United States,* 870 F.2d 1559, 1561 (Fed. Cir. 1989). Therefore, our appellate court requires that the trial judge evaluate three factors in determining whether intervention is timely:

> (1) the length of time during which the would-be intervenor[s] actually knew or reasonably should have known of [their] right[s;] (2) whether the prejudice to the rights of existing parties by allowing intervention outweighs the prejudice to the would-be intervenor[s] by denying intervention[;] (3) existence of unusual circumstances militating either for or against a determination that the application is timely.

*Belton Indus., Inc.* v. *United States*, 6 F.3d 756, 762 (Fed. Cir. 1993) (citations omitted; certain alterations in original); *see also* RCFC 24(a)(2).

Dismas filed a Motion To Intervene one day after Bannum filed the Complaint. Dismas also has established "an interest relating to the . . . transaction that is the subject of [this] action," because it was awarded the disputed contract in this case. AR 1268. The court is unaware of any prejudice to the existing parties that outweighs the prejudice to Dismas if it were denied intervention. Nor is the court aware of other unusual circumstances that that weigh either for or against intervention. In addition, no party opposed Dismas's Motion To Intervene.

For these reasons, on July 28, 2010, the court granted Dismas's Motion To Intervene. *See* RCFC 14(a).

## C.      Standard Of Review On A Motion On The Administrative Record.

Pursuant to the Tucker Act, as amended by the Administrative Dispute Resolution Act, Pub. L. No. 104-320 § 12, 110 Stat. 3870, 3874 (Oct. 19, 1996), the United States Court of Federal Claims reviews challenges to agency decisions, pursuant to the standards set forth in the Administrative Procedure Act ("APA").[13] *See* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."); *see also* 5 U.S.C. § 706(2)(A) ("The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"); *Banknote Corp. of Am., Inc*. v. *United States,* 365 F.3d 1345, 1350 (Fed. Cir. 2004) ("Among the various APA standards of review in section 706, the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'") (citations omitted).

The United States Court of Appeals for the Federal Circuit has held that a bid award may be set aside if: "(1) the procurement official's decision lacked a rational basis; or (2) the

---

[13] The APA is codified at 5 U.S.C. §§ 701-706.

procurement procedure involved a violation of regulation or procedure." *Weeks Marine, Inc.* v. *United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009) (citations omitted). When a contract award is challenged based on regulatory or procedural violation, "the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations." *Axiom Res. Mgmt.* v. *United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (internal quotation marks and citations omitted). This burden is even greater when the procurement is a "best value" procurement, as is the case here. *See Galen Med. Assocs.* v. *United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004) ("[A]s the contract was to be awarded based on 'best value,' the contracting officer had even greater discretion . . . since the relative merit of competing proposals is primarily a matter of administrative discretion.") (internal quotation marks and citations omitted); *see also TRW, Inc.* v. *Unisys Corp.*, 98 F.3d 1325, 1327 (Fed. Cir. 1996) ("In determining whether the agency has complied with the regulation authorizing best value procurement, the [reviewing authority] may overturn an agency's decision if it is not grounded in reason.").

On the other hand, if an award decision is challenged as being made without a rational basis, the trial court "must sustain an agency action unless the action does not evince rational reasoning and consideration of relevant factors." *Savantage Fin. Servs.* v. *United States*, 595 F.3d 1282, 1287 (Fed. Cir. 2010) (internal alterations, quotation marks, and citations omitted); *see also Centech Grp., Inc.* v. *United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (holding that the trial court must "determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis."). When the challenge is that a federal agency has acted in an arbitrary or capricious manner, the court may set aside the procurement "only in extremely limited circumstances." *United States* v. *John C. Grimberg Co., Inc.*, 702 F.2d 1362, 1372 (Fed. Cir. 1983). This rule recognizes a zone of acceptable results in each particular case and requires that the final decision evidences that the agency "consider[ed] the relevant factors" and is "within the bounds of reasoned decision making." *Baltimore Gas & Elec. Co.* v. *Natural Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983); *see also Weeks Marine*, 575 F.3d at 1368-69 ("We have stated that procurement decisions invoke [] highly deferential rational basis review. . . . Under that standard, we sustain an agency action evincing rational reasoning and consideration of relevant factors.") (internal quotation marks and citations omitted).

A motion for judgment on the administrative record, pursuant to RCFC 52.1, is akin to an expedited trial on the record and has no counterpart in the Federal Rules of Civil Procedure. *See* RCFC 52.1, Rules Committee Note (July 13, 2009); *see also Bannum*, 404 F.3d at 1356 ("[T]he judgment on an administrative record is properly understood as intending to provide for an expedited trial on the record."). Accordingly, on a motion for judgment on the administrative record, the court is required to determine whether the plaintiff has met the burden of proof to show that the relevant federal agency decision was without a rational basis or not in accordance with the law. *Id.* at 1348 (instructing the trial court to make "factual findings under RCFC [52.1] from the [limited] record evidence as if it were conducting a trial on the record"); *see also Afghan Am. Army Servs. Corp.* v. *United States*, 90 Fed. Cl. 341, 355 (2009) ("In reviewing cross-motions for judgment on the administrative record, the court must determine 'whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the

evidence in the record.'") (citations omitted).  The existence of a material issue of fact, however, does not prohibit the court from granting a motion for judgment on the administrative record, nor is the court required to conduct an evidentiary proceeding.  *See Bannum*, 404 F.3d at 1353-54 ("RCFC [52.1] requires the [United States] Court of Federal Claims, when making a prejudice analysis in the first instance, to make factual findings from the record evidence as if it were conducting a trial on the record.").

> **D.**      **Issues Raised By Plaintiff's Motion For Judgment On The Administrative Record.**

Count 1 of Bannum's July 26, 2010 Complaint alleges that the BOP failed to adhere to the Solicitation's Evaluation Criteria in considering Dismas's proposal.  Compl. ¶¶ 27-37.  Count 2 alleges that the BOP failed properly to evaluate Bannum's Technical/Management Proposal.  Compl. ¶¶ 38-42.  Count 3 alleges that the BOP failed to consider the most recent past performance information.  Compl. ¶¶ 43-55.  Count 4 alleges that the BOP failed to consider the relevance and import of Bannum's experience as the incumbent contractor.  Compl. ¶¶ 56-60.

All parties seek judgment upon the Administrative Record.

> **1.**      **Whether The Bureau Of Prisons Failed To Adhere To The Solicitation's Requirements.**

> > **a.**      **Plaintiff's Argument.**

The Solicitation provides that "[t]he contractor is not obligated to honor . . . [a]ny order for a single item in excess of 31,390 for the two-year base period and 17,202 for Option Year One, 17,885 for Option Year Two, and 18,250 for Option Year Three[.]"  AR 170.  The Solicitation also requires that an awardee "maintain proper zoning throughout the life of the contract," and warns that failure to establish and maintain proof of proper zoning "may result in elimination from the competitive range prior to award, and termination for default following award."  AR 204.  Bannum reads these two provisions in the Solicitation to require the contractor to accept offenders until 18,250 inmate days are reached in Option Year Three.  Pl. Mot. at 20.  Dismas's facility is only zoned for a maximum of 50 offenders.  During the procurement phase, however, Bannum contends that all parties understood that the BOP could require the contractor to house more than 50 offenders at a time.  Pl. Resp. at 10.  For example, on January 31, 2009 Dismas wrote: "Our site will be able to accommodate up to 50 offenders, [but] the BOP may exceed its original estimates if there is an unanticipated need for additional bed space in this area."  AR 702; AR 705; AR 708.  Similarly, Dismas's final proposal revision represented that its facility could "accommodate up to 50 residents and is readily expandable up to 68."  AR 1002.  The Dismas facility, however, is zoned only for 50 offenders per day.[14]  Therefore, the BOP failed to adhere to the Solicitation's requirements by awarding the contract to Dismas, contrary to 10 U.S.C. § 2305(b)(1),[15] FAR 15.305(a),[16] and FAR § 12.602(d).[17.]

---

[14] Sav. Zon. Reg. § 8-3025(b)(10n)(e) provides: "A maximum of 50 persons, in addition to the staff, shall be housed in the center."  Sav. Zon. Reg. § 8-3025(b)(10n)(e).

[15] 10 U.S.C. § 2305 provides: "The head of an agency shall evaluate sealed bids and

Bannum acknowledges that the CO can depart from the stated requirements of a solicitation, but the solicitation must be amended.  *See* 48 C.F.R. § 15.206(d).[18]  In this case, the BOP did not amend the Solicitation.  The CO also can accept an alternate proposal without amendment, but only if the solicitation includes a FAR 52.215-1(c)(9) clause.[19]  *See* 48 C.F.R. § 15.209(a)(2) ("If the Government would be willing to accept alternate proposals, the contracting officer shall alter the basic clause to add a paragraph (c)(9)[.]").  In this case, the Solicitation also did not include a paragraph (c)(9) clause.  AR 14-244.

### b.        Government's Response.

The Government posits five core arguments in response.  First, Dismas's proposal meets the Solicitation's requirement because "not all of the estimated maximum of 50 beds are for a group home; instead 20% of those beds (*i.e.* 10 beds) are reserved for home confinement." Gov't Mot. at 16 (citing AR 19).  Therefore, if an estimated 10 beds are reserved for home confinement, "it follows that the remaining 40 beds are to be used for group housing."  Gov't

---

[16] competitive proposals and make an award based *solely on the factors* specified in the solicitation."  10 U.S.C. § 2305(b)(1) (emphasis added).

[16] FAR 15.305(a) provides: "An agency shall evaluate competitive proposals and then assess their relative qualities *solely on the factors and subfactors specified in the solicitation*." 48 C.F.R. § 15.305(a) (emphasis added).

[17] FAR 12.602(b) provides: "Offers shall be evaluated in accordance with the criteria contained in the solicitation."  48 C.F.R. § 12.602(b).

[18] FAR 15.206(d) provides: "If a proposal of interest to the Government involves a departure from the stated requirement, the contracting officer shall amend the solicitation, provided this can be done without revealing to the other offerors the alternate solution proposed or any other information that is entitled to protection[.]"  48 C.F.R. § 15.206(d); *see also MVM, Inc.* v. *United States*, 46 Fed. Cl. 126, 131 (2000) (determining that a change from the Solicitation requires an amendment to the Solicitation and new bids under FAR 15.206).

[19] FAR 52.215-1(c)(9) provides:

Offerors may submit proposals that depart from stated requirements. Such proposals shall clearly identify why the acceptance of the proposal would be advantageous to the Government. Any deviations from the terms and conditions of the solicitation, as well as the comparative advantage to the Government, shall be clearly identified and explicitly defined.  The Government reserves the right to amend the solicitation to allow all offerors an opportunity to submit revised proposals based on the revised requirements.

48 C.F.R. § 52.215-1(c)(9).

Mot. at 17. Since Dismas's facility can accommodate up to 50 beds, the Solicitation's requirements are satisfied. Gov't Mot. at 17 (citing AR 702).

Second, inmate days and beds are interchangeable, *i.e.*, inmate days are equal to beds multiplied by 365. Gov't Mot. at 18. For this reason, the December 9, 2009 Solicitation provides that the awardee can refuse any request by the BOP to exceed 50 beds on any particular day in option year three, since 50 beds is the equivalent of 18,250 inmate days. Gov't Mot. at 18. The conversion from inmate-days-per-year to beds-per-day is required, because "beds" is a metric that was used "pre-award to determine whether a proposal complies with the Solicitation." Gov't Resp. at 3. The Administrative Record establishes that all parties understood that the Solicitation required the awardee to provide up to 50 beds on any given day. *See, e.g.*, AR 629, AR 631, AR 799 (Bannum), AR 778, AR 893a (Dismas), AR 1268 (BOP).

Third, if compliance with the Solicitation depends upon an offeror's ability to meet the BOP's actual needs, even if they are greater than 50 beds, then Bannum's proposal would be non-compliant if the "BOP's requirements exceed 52 beds." Gov't Mot. at 18.

Fourth, Bannum "ignores the fact that offerors must propose a facility which, by physical and legal necessity, cannot house a virtually limitless number of inmates on a daily basis." Gov't Resp. at 4. Under Bannum's theory, "there is no way for [the] BOP to determine pre-award if a proposal satisfies the requirements of the [S]olicitation[,] because the maximum number of inmates the contractor must be able to accommodate on a daily basis is not known until the end of the contract year." *Id.* Compliance with the Solicitation is based on whether an offeror is able to accommodate the estimated requirements. *Id.* Here, the 18,250 inmate day maximum must be considered in terms of what that requirement translates to on a daily basis, *i.e.*, 50 residents per day in Option Year 3. *Id.*

Fifth, even if the BOP did not adhere to the Solicitation, Bannum cannot show prejudice from the BOP's award to Dismas. Gov't Resp. at 5.

### c.     The Intervenor's Response.

Dismas adds that all parties "individually and collectively interpreted the Solicitation requirements as requiring the RRC to house between 43 and 50 inmates on a day-to-day basis." Int. Mot. at 11; Int. Resp. at 2 (citing *e.g.*, AR 487, AR 494, AR 501, AR 542, AR 631, AR 629 (Bannum); AR 702, AR 705, AR 708 (Dismas); AR 1176, AR 1268, AR 1408 (BOP)). For this reason, the BOP reduced the estimated number of inmate days for option year three specifically to comply with Savannah zoning requirements. Int. Mot. at 10-11; AR 422, AR 423f, AR 1406, AR 1408. The BOP took this action, "because it did not intend to assign more than 50 inmates to the facility on any given date." Int. Mot. at 11. Although Bannum "may opine that the Solicitation requires that the RRC house more than 50 inmates on a day-to-day basis, this is not a requirement, but . . . conjecture . . . as to how [the] BOP will administer the Contract." Int. Mot. at 11.

In addition, it is important for the court to understand that the Solicitation provides that approximately 20% of the offenders will be assigned to home confinement. AR 19. Therefore,

in option year three, an awardee must be able to accommodate an estimated 40 full-time residents who will be housed at the facility and 10 home confinement residents, not housed at the facility.  Int. Mot. at 13; AR 19; AR 148.  As a result, the resident inmates required to be housed at the RRC in option year three will fall below Savannah's 50 inmate zoning requirement by 20%.  Int. Mot. at 13.

### d.    The Court's Resolution.

The Solicitation states that the BOP's estimated requirements were: 31,390 inmate days in the two year base period; 17,202 inmate days in option year one; 17,885 inmate days in option year two; and 18,250 inmate days in option year three.  AR 19.  The Solicitation also states that the awardee can turn down inmates only when the required inmate days for that year have been reached.  AR 170-71.  The Solicitation does not set a maximum number of inmates that must be accepted on a daily basis.  *Id.*  Instead, the Solicitation describes the contract requirements in terms of the number of inmate days that the BOP expects to be utilized in each year.  *Id.*

Bannum's argument completely ignores the provision in the Solicitation indicating that only 80 percent of the estimated offenders are expected to be "full-time" residents housed at the facility; the remainder were anticipated either to be "furloughed" offenders (less than 1%) or "home confinement" offenders (20%).  AR 19.  Home confinement offenders and furloughed offenders, however, are not residents and are not counted in determining the total number of inmates for zoning purposes.  AR 19; AR 150; Sav. Zon. Reg. § 8-3025(b)(10n)(e).  The Solicitation is clear that home confinement inmates and furloughed inmates do count towards the total number of inmate days in the year.  AR 19-20.  In other words, the Solicitation required an awardee to provide up to 18,250 inmate days in option year three, but only 14,600 inmate days were expected to be filled by resident inmates—an average of 40 resident inmates per day.  AR 19-20, AR 170-71.  Since Dismas can house 50 "full time" residents *and* unlimited furloughed or home confinement offenders at a time without running afoul of zoning, the BOP's award to Dismas complied with the Solicitation and did not violate Savannah zoning regulations.

Assuming *arguendo* that Bannum's interpretation of the Solicitation is correct, Bannum still has failed to show prejudice.  The Government correctly argues that Bannum's interpretation of the Solicitation requires that "the contractor accommodate a virtually limitless number of residents on any particular day, so long as at the end of the contract year, the total number of inmate days does not exceed an average of 50 residents per day," a standard that even their facility—limited to 52 residents[20]—cannot meet.  Gov't Resp. at 3 (citing AR 799); *see also* Int. Resp. at 4.  This establishes that Bannum did not have a substantial chance of being the awardee, because both offers would have to be rejected and a new solicitation issued.

---

[20] The number of inmates that Bannum's RRC can hold is disputed.  Bannum cites to a Memorandum prepared by Savannah's Fire Chief Timothy Horton, stating that the occupancy load of the RRC is 62 persons.  AR 893a.  This, however, refers to the maximum number of "occupants" that the RRC can hold at given time, not the "total inmates" who may reside at the RRC.  *Id.*  The court accepts the site inspector's conclusion that Bannum's facility can hold only 52 inmates at a time.  AR 799.

For these reasons, Bannum has failed to show that the award to Dismas was made on a different basis than the criteria set forth in the Solicitation, and, even under Bannum's theory, that it would have been awarded the contract.  *See Banknote Corp. of Am., Inc.* v. *United States*, 56 Fed. Cl. 377, 386 (2003) ("It is hornbook law that agencies must evaluate proposals and make awards based on the criteria stated in the [S]olicitation."), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004); *Electronic Data Sys., LLC* v. *United States,* 93 Fed. Cl. 416, 419 (2010) (To demonstrate prejudice, the protestor must show "that there was a substantial chance it would have received the contract award but for that error.") (citations and internal quotation marks omitted).

> ### 2.    Whether The Bureau Of Prisons Properly Evaluated Plaintiff's Technical/Management Proposal.

> #### a.    Plaintiff's Argument.

Bannum argues that the BOP violated the Solicitation's Evaluation Criteria by granting Dismas a [redacted], [redacted] risk rating for Technical/Management as a whole and a [redacted] rating for the Site Validity and Suitability Subfactor.  Pl. Mot. at 24; *see also* AR 1288.  Because Dismas's proposal does not conform to the Solicitation, the BOP should have rated Dismas's Site Validity and Suitability as [redacted].  Pl. Mot. at 24.  For the same reason, the BOP improperly determined that there was [redacted] regarding Dismas's Site Validity and Suitability, since zoning violations potentially could shut the facility down.  Pl. Mot. at 24; *see also* AR 1288.

Bannum's Technical/Management proposal should have been rated [redacted].  First, Bannum's facility is located at the airport, where Savannah zoning regulations do not apply, allowing Bannum to house more than 50 residents at a time.  Pl. Mot. at 25; *see also* AR 456, AR 1281.  Second, Bannum's proposal has "several strengths and no weaknesses were noted."  Pl. Mot. at 25.  Third, Bannum was entitled to a higher rating, because the Technical/Management proposal duplicates all aspects of the incumbent Savannah contract that "has consistently received overall [redacted] ratings for [Bannum's] performance."  *Id.*; *see also* AR 456-57, AR 459; AR 672.  Fourth, Bannum proposed three new programs that were acknowledged as significant strengths: [redacted].  AR 518; AR 1283.

> #### b.    Government's Response.

As for Bannum's risk argument, the Government responds that the Solicitation "does not require the contractor to accept more than 50 inmates per day; therefore, there is no risk that the 50-resident zoning restriction would prevent Dismas from fulfilling its obligations under the contract."  Gov't Resp. at 7.  The Government notes that in the pre-solicitation phase, "Bannum took the exact opposite position, and expressed concern that the BOP's then estimate of 52 inmates was too high"—noting that the estimate "represents a [redacted] increase over the current average contract actual usage."  Gov't Mot. at 21 (citing AR 424).  The Government contends that the "risk, properly stated, is . . . that the offeror will not be able to provide RRC services to the maximum number of inmates stated in the [S]olicitation.  The possibility that the BOP's estimate might be too low is a risk that is not specific to any potential offeror[.]"  Gov't Mot. at 22.  Accordingly, the BOP correctly found that Dismas's proposal posed [redacted],

because the Dismas facility can accommodate the estimated number of inmates required to be housed under the Solicitation.  Gov't Mot. at 22 (citing AR 702; AR 1280).

Likewise, Bannum's argument that it should have received a higher Technical/Management rating in light of its ability to house more than 50 beds is undermined by the admission that Bannum's facility could accommodate only up to 52 residents (AR 799), a difference of only two beds.  Gov't Mot. at 21.  In addition, awarding Bannum a higher technical score based upon the ability to house more inmates than estimated in the Solicitation could mislead offerors to assume that the BOP's estimates were "significantly at variance with the agency's requirements."  Gov't Mot. at 21.

The BOP's assessment of Bannum's Technical/Management proposal was neither arbitrary and capricious nor an abuse of discretion.  Bannum's rating was based on five subfactors: Site Location; Accountability; Programs; Facility; and Personnel.  AR 1280-88.  The Solicitation defined a 'Blue/Very Good' rating as one where the "offeror's proposal meets *and exceeds* the requirements of the [S]olicitation."  AR 242 (emphasis added).  Because Bannum's overall Technical/Management proposal did not exceed the Solicitation's requirements, the BOP's decision to rate this aspect of  Bannum's proposal [redacted] rather than [redacted] was consistent with the Solicitation's evaluation criteria.  Gov't Mot. at 24.

### c.    The Intervenor's Response.

The BOP assessed Dismas's zoning documents and determined that Dismas could use the site location as an RRC.  AR 1176.  The BOP also noted that Dismas's facility can accommodate 50 inmate beds, as required by the Solicitation.  *Id.*  Thus, because Dismas's proposal met the requirements of the Solicitation and abided by Savannah's zoning restrictions, there was no reason for the BOP to assess any potential risk to Dismas's Technical/Management approach.  Int. Mot. at 13.

Dismas argues that the BOP's risk rating was appropriate, because the Solicitation provides on average that Dismas's RRC is required to accommodate 40 full-time residents and 10 home confinement residents per day in option year three.  Int. Mot. at 12.  In addition, the BOP's decision also to rate Bannum's Technical/Management proposal as [redacted] was rational for several reasons: 1) Bannum's performance under the incumbent contract was not required to be evaluated under the Technical/Management factor, but under the Past Performance factor; 2) Bannum fails to consider that Technical/Management is comprised of five equally weighted factors; 3) Bannum's strengths under the Accountability factor resulted in a rating of [redacted], but the BOP properly considered all five of the Technical/Management factors (and subfactors) in making an overall determination; and 4) the BOP acted reasonably in granting a [redacted] rating for Site Location, Programs, and Facility.  Int. Mot. at 16.

### d.    The Court's Resolution.

The United States Court of Appeals for the Federal Circuit has held that procurement decisions are subject to highly deferential review, requiring the trial court to "sustain an agency action evincing rational reasoning and consideration of relevant factors."  *Weeks Marine*, 575 F.3d at 1369 (internal quotation marks and citations omitted).  Therefore, as a matter of law,

"[n]aked claims of disagreement with evaluations, no matter how vigorous, fall short of meeting the heavy burden of demonstrating that the findings in question were the product of an irrational process and hence were arbitrary and capricious." *Banknote*, 56 Fed. Cl. at 384; *see also United Enter. & Assocs.* v. *United States*, 70 Fed. Cl. 1, 26 (2006) ("[M]ere disagreement with the agency's judgment concerning the adequacy of the proposal is not sufficient to establish that the agency acted unreasonably"). Moreover, it is specifically well settled that contracting officers are given broad discretion in evaluating technical proposals. *See E.W. Bliss Co.* v. *United States*, 77 F.3d 445, 449 (Fed. Cir. 1996) ("[T]echnical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess."); *see also Omega World Travel, Inc.* v. *United States*, 54 Fed. Cl. 570, 578 (2002) ("It is well settled that contracting officers are given broad discretion with respect to evaluation of technical proposals.").

In this case, the BOP's analysis of the Site Validity and Suitability subfactor carefully considered Dismas's ownership status and zoning approvals. AR 204; AR 422 (CO noting that "we may have to reduce the number of beds for [option year 3]"); AR 1408 (reducing the inmate days and beds in option year three to "18,250 inmate days" or "50 beds"); AR 825 (the BOP requesting more information on how Dismas intended to adhere to the 100 square foot per occupant requirement of Sav. Zon. Reg. § 8-3025(b)(10n)(c)); AR 953 (requesting information on how Dismas intends to meet the requirement that one staff security guard and one staff supervisor be present at all times, pursuant to Sav. Zon. Reg. § 8-3025(b)(10n)(e)); AR 1176.

The Source Selection Decision confirmed that after considerable due diligence, the BOP was satisfied that Dismas complied with Sav. Zon. Reg. § 8-3025(b)(10n)(c) and Sav. Zon. Reg. § 8-3025(b)(10n)(e). AR 1280 ([redacted]). Therefore, Bannum's dissatisfaction with the BOP's Site Validity and Suitability assessments amount to no more than "mere disagreement," and does not provide a sufficient basis to overturn the BOP's determination. *See Bannum* v. *United States*, 91 Fed. Cl. 160, 174 (2009) (stating that the court will not "second-guess the discretionary acts of procurement officials").

As for the BOP's assessment of Bannum's Technical/Management proposal, the Administrative Record evidences that the BOP considered each relevant factor in the March 25, 2010 Source Selection Decision, including: Site Location; Accountability; Programs; Facility; and Personnel. AR 243. Under Accountability and Personnel, the BOP acknowledged Bannum's strengths including: [redacted]. AR 1283-84; AR 1288. Accordingly, Bannum received a rating of [redacted] for both of these factors. AR 1282, AR 1287. As for the other factors, the BOP afforded Bannum only one strength, and rated Site Location, Programs, and Facility as [redacted]. AR 1280-82; 1284-87. Therefore, the BOP rated Bannum's Technical/Management as [redacted]. AR 1288. Although Bannum challenges this determination, the court discerns nothing in the Administrative Record evidencing that the evaluation process was either arbitrary or irrational. *See Weeks Marine*, 575 F.3d at 1370-71 (sustaining an agency action evincing "rational reasoning and consideration of relevant factors").

For these reasons, the court has determined that the BOP carefully considered and documented all relevant factors in evaluating Bannum's Technical/Management proposal.

### 3. Whether The Bureau Of Prisons Considered Plaintiff's Most Recent Past Performance Information.

#### a. Plaintiff's Argument.

The Solicitation requires that the BOP perform an evaluation based upon the most recent past performance information available.  AR 242 ("More recent, more relevant performance information will have a greater positive impact on the Past Performance evaluation than less recent, less relevant information. . . .  The Government may review more recent contracts or performance evaluations to ensure that corrective actions have been implemented and to evaluate their effectiveness.").  Bannum argues that the CO failed to do so.  *Id.*  Bannum argues that the BOP prematurely issued the Past Performance Evaluation on December 18, 2009.  AR 1011, AR 1297.  The CO evaluated only completed CEFs, *i.e.*, annual assessments conducted by the CO's Technical Representative,[21] not the Monitoring Reports that occur more frequently and on which the CEFs largely are based.  Pl. Mot. at 27-28; AR 1013; *see also* BOP COMMUNITY CORRECTIONS CONTRACT ADMINISTRATION, *available at* http://www.bop.gov/business/ccc_contracting_contract_admin.jsp (last visited Nov. 15, 2010).

The Solicitation did not limit Past Performance evaluation to review of CEFs.  Pl. Mot. at 28; *see also* AR 242.  The CO, however, relied on only completed CEFs for Bannum's [redacted] contracts.  *Id.*  These were not the most recent evaluations available.  *Id.*  The BOP had access to "finalized Full and Interim Monitoring Reports and Bannum's responses from which the CEFs were comprised," even if more recent finalized CEFs were not available for review.  Pl. Mot. at 28.  Therefore, the BOP's evaluation did not take into account the recent advancements and improvements Bannum made to its programs.

More importantly, Bannum specifically was prejudiced by the CO's use of a CEF regarding the [redacted] RRC for the period of January 1, 2008 to December 31, 2008.  Pl. Mot. at 29.  This outdated CEF rated the [redacted] RRC as [redacted], giving Bannum a total of [redacted] ratings for Past Performance and [redacted] ratings.  *Id.*  The most recent CEF for Bannum's [redacted] RRC (January 1, 2009 to December 31, 2009), however, was rated [redacted].  AR 1419.  Therefore, if the CO had used the most recent CEF for [redacted], "the data would have yielded [redacted] overall ratings and [redacted] overall ratings, which should have equated to an overall [redacted] rating for Past Performance[.]"  Pl. Mot. at 29.  This information was particularly important in this procurement, since the BOP almost never submits CEFs for contractor comment in a timely manner, delaying the CEF finalization process by as many as 15 months.  Pl. Resp. at 17.

#### b. Government's Response.

The Government responds that the exclusive use of finalized CEFs is neither arbitrary and capricious nor an abuse of discretion, since "the regulations[22] clearly provide for several

---

[21] Specifically, the CO evaluated the following CEFs: [redacted].  AR 1013.

[22] FAR § 42.1503 provides:

levels of internal agency review, including an opportunity for the contractor to comment on the ratings before a contractor evaluation form can be finalized." Gov't Mot. at 25. The BOP used the most recent finalized CEFs available at the time that Past Performance was assessed on December 18, 2009. Gov't Mot. at 26-27 (citing AR 1367-68).

The Government also argues that Bannum misread the Solicitation, that states: "The Government *may* review more recent contracts or performance evaluations to ensure that corrective actions have been implemented and to evaluate their effectiveness." AR 242 (emphasis added). There is nothing in this "permissive language that requires the BOP to utilize contractor evaluation forms that have not been part of the internal agency review process described in FAR § 42.1503(b)." Gov't Mot. at 28. Moreover, the BOP's decision to rely only on the finalized CEFs, covering the entire performance period, rather than Monitoring Reports covering performance observed during a single visit, was not arbitrary, capricious nor an abuse of discretion. Gov't Mot. at 29 (citing AR 669).

In addition, Bannum has not established that more current contractor evaluations would have increased Bannum's overall Past Performance rating above [redacted]. Gov't Resp. at 11. Bannum ignores the fact that the CO's determination of Past Performance was based on the conclusion that "the numerous repeat and new deficiencies cited among the contracts *far* outweighed all the strengths listed." AR 1274 (emphasis added). The more recent CEFs also reveal numerous, additional deficiencies by Bannum. AR 1441-44 ([redacted]). Because of these [redacted], Bannum cannot establish that the CO's evaluation would have been different if the more recent [redacted] information had been considered. Gov't Resp. at 11.

### c.    Intervenor's Response.

Dismas adds that if the BOP used unfinalized CEFs and Monitoring Reports, it would have risked violating FAR 42.1503(b), because "Bannum had not been given the opportunity to rebut any negative comments or weaknesses identified in the Full and Interim Monitoring Reports and any disagreements between the parties had not been reviewed by a 'level above the contracting officer.'" Int. Mot. at 19. In any event, the Solicitation does not require the BOP to review the most recent past performance information. Int. Mot. at 19-20. The Solicitation only states that the BOP "may" review more recent past performance information "but does not obligate the Government to review information that has not been finalized in accordance with the procedures set forth in FAR 42.1503." Int. Mot. at 20; *see also* AR 242-43. Moreover,

---

Agency evaluations of contractor performance prepared under this subpart shall be provided to the contractor as soon as practicable after completion of the evaluation. Contractors <u>shall</u> be given a minimum of 30 days to submit comments, rebutting statements, or additional information. Agencies <u>shall</u> provide a review at a level above the contracting officer to consider disagreements between the parties regarding the evaluation. The ultimate conclusion on the performance evaluation is a decision of the contracting agency. . . . These evaluations may be used to support future award decisions.

48 C.F.R. § 42.1503(b) (emphasis added).

Bannum's Past Performance Proposal endorsed the use of finalized CEF ratings and did not object to the use of unfinished CEFs or the Full and Interim Monitoring Reports.  AR 672-85.

More to the point, Bannum submitted only one highly relevant contract, the incumbent contract.  Int. Mot. at 21; *see also* AR 242.  On the other hand, Dismas submitted five highly relevant and highly rated contracts, all of which were rated [redacted].  Therefore, even if the BOP used Bannum's most recent past performance information, that alone would not have been enough to justify awarding the contract to Bannum.  Int. Mot. at 21.

The Solicitation's evaluation criteria and FAR required that the CO also consider Bannum's deficiencies in Past Performance.  Int. Mot. at 9 (citing 48 C.F.R. § 15.305(a) ("The relative strengths, deficiencies, significant weaknesses, and risks supporting proposal evaluation shall be documented in the contract file.")); *see also* AR 243 ("[The] Government will consider the number and severity of the problems and appropriateness and effectiveness of any corrective action taken (not just planned).").  Subsequent provisional ratings and narratives showed that Bannum continued to have deficiencies in three of the four areas where it previously was assigned repeat deficiencies.  AR 1429; AR 1441; AR 1443-44; AR 1451-54; AR 1474-75; AR 1532-34; AR 1539-40; AR 1547-48; AR 1554-55; AR 1564.  For these reasons, Bannum cannot show prejudice.

### d.    The Court's Resolution.

As a matter of law, disappointed bidders face a high burden to overturn a procurement on the grounds that the past performance assessment violated 5 U.S.C. § 706(2)(A).  The burden of proof is on the disappointed bidder to demonstrate by a preponderance of the evidence that agency action was arbitrary and capricious or in violation of law.  *See Ellsworth Assocs., Inc.* v. *United States*, 45 Fed. Cl. 388, 392 (1999) ("To succeed under either test, a plaintiff must prove the arbitrary and capricious nature of the Government's actions by a preponderance of the evidence.").  The United States Court of Federal Claims has held that there is no "bright-line requirement concerning which or how many past performance references a reviewing agency must contact when conducting a past performance evaluation." *Arora Grp., Inc.* v. *United States*, No. 04-336, 2004 U.S. Claims LEXIS 267, *38 (Fed. Cl. Aug. 31, 2004).  Instead, "[a]gency personnel are generally given great discretion in determining what references to review in evaluating past performance."  *Seattle Sec. Serv. Inc.* v. *United States*, 45 Fed. Cl. 560, 567 (2000); *see also PlanetSpace, Inc.* v. *United States*, 92 Fed. Cl. 520, 539 (2010) ("[W]hat does or does not constitute 'relevant' past performance falls well within the [agency's] considered discretion."); *World Airways, Inc.*, B-402674, 2010 WL 4926538, *6 (Comp. Gen. June 25, 2010) ("While an agency is required to evaluate offerors' past performance reasonably and on the same basis, an agency has considerable discretion in determining, for example, what past performance information it will consider.").

Bannum fails to demonstrate that the agency violated 5 U.S.C. § 706(2)(A) for several reasons.  The Solicitation clearly does not require the BOP to consider the most recent past performance data, as Bannum suggests.  Pl. Mot. at 28.  Instead, the Solicitation states:

> The recency and relevancy of Past Performance information is critical to the
> Government's evaluation.  More recent, more relevant performance information

will have a greater positive impact on the Past Performance evaluation than less recent, less relevant performance. . . .  Where relevant performance record indicates performance problems, the Government will consider the number and severity of the problems and the appropriateness and effectiveness of any corrective actions taken (not just planned or promised).  The Government *may review more recent contracts or performance evaluations* to ensure corrective actions have been implemented and to evaluate their effectiveness.

AR 243 (emphasis added).

Not surprisingly, the Solicitation requires that more recent Past Performance data receive more weight than less recent Past Performance data.  *Id.*  But this requirement does not mandate the BOP to consider only the most recent past performance information.  *Id.*  Notably, the Solicitation provides only that the BOP "may review" more recent performance evaluations.  AR 242.

The BOP's reliance on final CEFs was entirely appropriate as they summarize the findings of several Government officials, on which the contractor has an opportunity to provide comment.  *See* 48 C.F.R. § 42.1503(a) ("Agency procedures for the past performance evaluation system shall generally provide for input to the evaluations form the technical office, contracting office, and where appropriate, end users of the product or service."); *see also* 48 C.F.R. § 42.1503(b) (After evaluations are prepared, they are to "be provided to the contractor" who "shall be given a minimum of 30 days to submit comments, rebutting statements or additional information. . . .  These evaluations may be used to support future award decisions, and therefore should be marked 'Source Selection Information[.]'").  Before a CEF is final, it is reviewed by both the CO and an official at one level above the CO.  *See Bannum, Inc.* v. *United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005) ("[R]eview 'at a level above the contracting officer' [as required by 48 C.F.R. § 42.1503(b),] contemplates review by a person with authority to direct the contracting officer's response.").  Because of the increased agency review and contractor input that goes into a finalized CEF, there is nothing irrational nor arbitrary about the BOP relying on them in making a past performance evaluation.  Therefore, Bannum has failed to demonstrate that the use of only final CEFs was contrary to the Solicitation or violated 5 U.S.C. § 706(2)(A).  *See JWK Int'l Corp.* v. *United States*, 52 Fed. Cl. 650, 659 (2002) (review of bid protests "should be limited to determining whether the evaluation was reasonable, consistent with the stated evaluation criteria and complied with relevant statutory and regulatory requirements"), *aff'd* 56 Fed. Appx. 474 (Fed. Cir. 2003).

Bannum's focuses on the [redacted]RRC, because in the most recent CEF [redacted]was rated as [redacted], a rating that Bannum contends would result in an overall rating of [redacted] for Past Performance.  Pl. Mot. at 29; *see also* AR 1419.  But the BOP used a CEF for [redacted] for the period of January 1, 2008-December 31, 2008.  AR 1013.  Therefore, the BOP used the most recent CEF available for [redacted].  AR 1013.  Moreover, at the time of award on April 6, 2010, this was the second most recent CEF and reflected a period that ended only 1 year and 4 months prior to award.  AR 1298.  The Solicitation instructed offerors to submit the five "most relevant contracts and/or subcontracts that were, or are currently being, performed in the past

[three] years[,]" suggesting that the BOP considers past performance data compiled within the last three years to be relevant.  AR 201.

Even assuming that the use of the 01/01/08-12/31/08 CEF for [redacted] violated 5 U.S.C. §706(2)(A), Bannum has still failed to demonstrate prejudice.  *See Alfa Laval Separation, Inc.* v. *United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999) ("To prevail in a bid protest, a protester must show a significant, prejudicial error in the procurement process.").  Although more recent CEFs show improvement in Bannum's [redacted] RRC, these improvements are offset by continued performance issues evidenced in Interim and Full Monitoring Reports and unfinalized CEFs for Bannum's other facilities.  AR 1429; AR 1441; AR 1443-44; AR 1451-54; AR 1474-75; AR 1532-34; AR 1539-40; AR 1547-48; AR 1554-55; AR 1564.  On the other hand, all of Dismas's facilities were highly relevant and highly rated as [redacted].  AR 1274.  The BOP was under no legal obligation to rate both offerors' Past Performance the same, when the BOP's assessment of Past Performance shows that Dismas's record was better than that of Bannum.  *See Hyperion, Inc.* v. *United States*, 92 Fed. Cl. 114, 119 (2010) (determining that adjectival ratings assigned to the reference contracts are "merely a guide" for the agency's decision making process).

For these reasons, the court has determined that Bannum failed to establish that the BOP's Past Performance evaluation was arbitrary, capricious, an abuse of discretion, or otherwise violated any law.

### 4.   Whether The Bureau Of Prisons Considered The Relevance And Import Of Plaintiff's Experience As The Incumbent Contractor.

#### a.   Plaintiff's Argument.

The Solicitation states: "More recent, more relevant performance information will have a greater positive impact on the Past Performance evaluation than less recent, less relevant performance."  AR 242-43.  Therefore, Bannum concludes that the BOP was required to give "extra consideration to the Savannah ratings in the Past Performance Evaluation, not necessarily because it was the incumbent, but because the incumbent contract was the most highly relevant contract possible."  Pl. Mot. at 32.  Indeed, the Contracting Officer agreed that the Savannah contract was "highly relevant."  AR 1269.  Bannum received [redacted] ratings, one of which was for the incumbent contract, and [redacted] ratings, that "evidences . . . simple averaging occurred."  Pl. Mot. at 32; *see also* AR 1013; AR 1269.  The incumbent contract, however, was given no "extra consideration" as required by the Solicitation.  *Id.*

#### b.   Government's Response.

Although the Solicitation states that more recent relevant information will have a greater positive impact on past performance, it further provides: "[W]here relevant performance indicates performance problems, the Government will consider the number and severity of the problems and the appropriateness and effectiveness of any corrective actions taken (not just planned or promised)."  AR 242-43.  Therefore, the Government argues that the Solicitation does not limit the evaluation of "performance problems" only to the most relevant and recent

contracts.  Gov't Mot. at 31.  In fact, repeat deficiencies, even in less recent contracts, may result in a lower rating.  *Id.*

Of the five contracts that Bannum listed as references, four were considered moderately relevant, and only one was considered highly relevant.  AR 1291.  Two contracts received a rating of [redacted] and three received ratings of [redacted].  AR 1274.  The BOP concluded that "the numerous repeat and new deficiencies cited among the contracts evaluated far outweighed all the strengths listed," resulting in an overall [redacted] rating in Past Performance.  Gov't Mot. at 32; *see also* AR 1274.  "[R]epeat deficiencies are particularly significant because they demonstrate the offeror's failure to take appropriate and effective corrective action in response to performance problems that prior monitoring brought to light."  Gov't Mot. at 32; s*ee also* AR 126 ("[A] repeat deficiency is a serious issue.").  The BOP determined that "new and repeat deficiencies from 'moderately relevant' contracts outweighed the [acknowledged] strengths of Bannum's 'highly relevant' [incumbent] contract[.]"  Gov't Resp. at 12.

### c.      The Intervenor's Response.

Dismas responds that the Solicitation "did not suggest that the impact of one positive highly relevant contract reference would outweigh a string of deficiencies in the remaining four moderately relevant references."  Int. Mot. at 11.  After weighing the strengths and weaknesses in Bannum's record, the CO concluded that "[t]he numerous repeat and new deficiencies cited among the contracts evaluated far outweighed all the strengths listed."  AR 1274.

### d.      The Court's Resolution.

In this case, the Solicitation states that "[m]ore recent, more relevant performance information will have a greater positive impact on the Past Performance evaluation than less recent, less relevant performance."  AR 242.  Relevance, for purposes of the Solicitation, "refers to contracts that are of similar size, scope, and complexity" as the current procurement.  AR 201.  When there are performance problems, the BOP is to consider the number and severity of the problems and any corrective action taken.  AR 243.  The Solicitation further allows the BOP to discount less relevant contracts.  AR 201 ("Offeror's past performance evaluations may be negatively impacted if they submit contracts in response to these instructions which are considered less relevant or irrelevant[.]").

Based on Bannum's Past Performance references, the CO concluded:

Only one contract (the incumbent) was considered "highly relevant" and received an overall [redacted] ratings.  Three of the "moderately relevant" contracts (similar in scope and complexity but differ in size) received [redacted] ratings and one received a [redacted] rating.  The numerous repeat and new deficiencies cited among the contracts evaluated far outweighed all the strengths listed.  As a result of this analysis, and after a careful review of the most recent past performance evaluations on file, Bannum received an overall [redacted] Past Performance rating for contracts submitted for RFP 200-1050-SE.

AR 1274.

The "numerous repeat and new deficiencies" that the BOP refers to consist of [redacted]. AR 1271-72. [redacted]. AR 1272. [redacted]. *Id.* [redacted]. *Id.* [redacted]. AR 1273. [redacted]. *Id.*

The Solicitation states that the BOP must consider "the number and severity of [past performance] problems and the appropriateness and effectiveness of any corrective actions taken (not just planned or promised)" in assessing Past Performance. AR 243. In light of the serious deficiencies that the BOP noted, the court has determined that the CO's past performance evaluation was both reasonable and consistent with the Solicitation. *See Metro. Van & Storage, Inc.* v. *United States*, 92 Fed. Cl. 232, 255-56 (2010) ("In the bid protest context, the assignment of a past performance rating is reviewed only to ensure that it was reasonable and consistent with the stated evaluation criteria and applicable statutes and regulations, since determining the relative merits of the offerors' past performance is primarily a matter within the contracting agency's discretion."); *see also Linc Gov't Servs., LLC* v. *United States*, No. 10-375, 2010 WL 4484021, at *48 (Fed. Cl. Oct. 22, 2010) (same). The fact that Bannum's performance for the incumbent contract was highly relevant and highly rated did not prevent the BOP from concluding that other relevant past performance weighed against a rating of [redacted].

For these reasons, the court has determined that the BOP appropriately considered and balanced Bannum's overall past performance in a manner that was not arbitrary, capricious, an abuse of discretion, or otherwise violated any law.

## IV.    CONCLUSION.

For these reasons, Plaintiff's August 24, 2010 Motion For Judgment Upon The Administrative Record is denied. The Clerk of the Court for the United States Court of Federal Claims is directed to enter judgment on behalf of the Government and Defendant-Intervenor.


**IT IS SO ORDERED.**

_s/Susan G. Braden_
**SUSAN G. BRADEN**
**Judge**